UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| v. | : | Case No. 2:10-CR-146 |
| | : | |
| JOHN ROM | : | |

**OPINION and ORDER**

The Grand Jury returned a four count indictment charging Defendant John Rom with three counts of Fraud and Misuse of Visas/Permits for false statements to the United States Citizenship and Immigration Service under 18 U.S.C. § 1546 and one count of Conspiracy to Defraud the United States for bringing illegal aliens into the United States under 18 U.S.C. § 371. Defendant filed a motion to suppress statements he made to law enforcement officers, arguing that the statements were made in violation of his Fifth Amendment privilege against self-incrimination and his rights under the Due Process clause. Mot. to Suppress 1, ECF No. 24. Defendant argues that his difficulties understanding the English language, unfamiliarity with law enforcement, and his traumatic experiences as a survivor of the Khmer Rouge show that he did not make an intelligent, knowing, and voluntary waiver of his *Miranda* rights. *Id.* Separate from the question of the validity of the

1

waiver, Defendant additionally argues that his statements were not voluntary. *Id.*

## Statement of the Facts

Defendant was born in Cambodia in 1963. Defendant endured the atrocities of the Khmer Rouge regime as a young man, including an instance where he was buried up to his neck for three days by Khmer soldiers and forced to watch the soldiers kill and dump the bodies of others. As a result of his traumatic youth and difficult financial circumstances, Defendant has never had any official schooling, cannot read or write in any language, and suffers from Post-Traumatic Stress Disorder.

In 1981, Defendant and his family came to the United States and moved to California. In San Jose, Defendant met his first wife, Saren Thorn, with whom he had four children. They lived in San Jose until 1996, when Ms. Thorn passed away. After her death, Defendant was unable to care for his children, so the children lived with other family members, and Defendant moved to Lowell, Massachusetts. Defendant has subsequently married three more times: to Kong Liv in 2003, to Sokha Sin in 2005, and to Chenda Meas in 2010. Defendant has at least two children with Ms. Liv and at least one child with Ms. Meas. Testimony revealed that Defendant owned and operated a donut shop in California for approximately fifteen years.

Defendant became a naturalized United States citizen in 2002. He failed the language portion of the test on his first try but passed it on his second try. This portion of the test requires applicants to demonstrate an ability to speak English conversationally. Opp'n to Mot. to Suppress 1, ECF No. 27. Defendant states that third-party assistance was necessary for him to complete the various forms required to apply for citizenship because he struggled to comprehend the English language. Reply in Supp. of Mot. to Suppress 8, ECF No. 30. Further, Defendant provides links to studies which show that Cambodians living in the United States struggle to learn English and acculturate poorly, and argues that these studies reflect Defendant's experiences. Mot. to Suppress 5.

During their investigation, Special Agents Petterson and Baldwin approached Defendant's residence in an attempt to make contact with Defendant by using a "ruse" technique. The agents pretended to be investigating a fictional male, and knocked on Defendant's door under the guise of asking Defendant if he knew the location of the fictional male. Through a short conversation with the agents, Defendant identified his neighbor as a potential target. The agents testified that Defendant demonstrated no difficulties conducting this conversation in English. Further, throughout their investigation the Special Agents spoke with several individuals who had traveled to

Cambodia with Defendant. Special Agent Baldwin testified that these individuals explained that they spoke only English with Defendant during these travels.

On the morning of November 23, 2010, Special Agents Baldwin and Petterson and two other United States Immigration and Customs Enforcement ("ICE") agents arrived at what they believed to be Defendant's residence in Lowell, Massachusetts with the intention of placing Defendant under arrest. Prior to their arrival, the agents informed the Lowell Police Department that they intended to execute the warrant. However, upon arrival the landlord informed the agents that she recently evicted Defendant because he had been in a fight which caused the destruction of property within the home. The homeowner told the agents Defendant made a hole in the wall of the home, and showed the hole to the officers. The homeowner further explained that Defendant had brandished a knife during the fight. Eventually, the homeowner informed the agents that Defendant had moved to a different residence in Lowell, Massachusetts.

Subsequently, the ICE agents informed the Lowell Police Department that they intended to proceed to a different address to execute the warrant. In light of the changed circumstances, the Lowell Police Department Warrant Squad decided to accompany the ICE agents to Defendant's actual Lowell residence. The officers entered the apartment building, knocked on Defendant's

door and announced their presence, and asked if anyone else was in the apartment.  The Defendant responded that only his daughter was in the residence with him.  Defendant then opened the door. The agents secured the premises with a protective sweep.  Five officers entered the residence and the other four officers remained outside the apartment.  The agents suggested that Defendant call someone to pick up the two-year-old child. Defendant first called his wife, Ms. Meas, who was unable to come.  Next, Defendant's daughter, Amy Rom, was called at her work and asked to come to Defendant's residence.  Defendant communicated in English with the agents as well as with his wife and Amy Rom.  At no time did Defendant request an interpreter or indicate that he was unable to speak or understand English. Opp'n to Mot. to Suppress 3.

    The officers first read *Miranda* warnings to Defendant in English, and then allowed Defendant to read the warnings in English.  *See Miranda v. Arizona*, 384 U.S. 436 (1966). Additionally, the officers asked Amy Rom to translate *Miranda* warnings into Khmer for her father.  She told the agents that Defendant doesn't need an interpreter because he speaks English "very well."  Detention Hr'g Tr. 15, ECF No. 27, Ex. A.  Amy Rom testified that she eventually read the warnings to her father in

a mix of Khmer and English.[1]  Next, Defendant contends that the officers asked Amy Rom to tell Defendant to sign the *Miranda* waiver.  Amy Rom says that she told Defendant to sign the paper, and he did.  Mot. to Suppress 6.

The officers were in Defendant's home for fifteen to twenty minutes.  Five plainclothes officers actually entered Defendant's apartment, and four plainclothes officers remained outside.  Defendant was not placed in handcuffs while at his residence, although he was directed to remain seated.

After Defendant signed the *Miranda* waiver, the officers arrested Defendant and brought him to the Lowell police station.  At the station, Defendant was questioned by Special Agents Baldwin and Petterson.  At no time during this questioning did Defendant request a lawyer or an interpreter or state that he could not speak English.  Opp'n to Mot. to Suppress 3.

Throughout interrogation, Special Agent Baldwin reported that Defendant hesitated with many pauses and "ums" before answering questions, brought up unrelated subjects, repeated questions back, was unable to answer simple questions, would not look at the agents when responding, and would change his answers.  Law Enforcement Report 3-4.  Defendant argues such

---

[1] Amy Rom testified that she is not proficient with the Khmer language.  As a result, she typically communicates with Defendant using a mixture of Khmer and English, and Defendant must use at least some English to communicate with her.

behavior is evidence that Defendant does not competently understand English. Mot. to Suppress 13. Special Agent Baldwin testified that his training and experience caused him to interpret Defendant's behavior as deceptive.

After photographs and fingerprinting, Defendant was transported to Boston. In the period between the interrogation at the Lowell police station and his initial appearance in a federal court in Boston later that same day, the Government states Defendant was not questioned any further. Opp. to Mot. to Suppress 3. Special Agent Baldwin testified that any communication with Defendant during transport was limited to answering Defendant's procedural questions and "idle" chatter.

## Discussion

To prove a waiver of *Miranda* rights, "the government must show (1) that the relinquishment of the defendant's rights was voluntary, and (2) that the defendant had a full awareness of the right being waived and of the consequences of waiving that right." *United States v. Jaswal*, 47 F.3d 539, 542 (2d Cir. 1995) (citing *Moran v. Burbine,* 475 U.S. 412, 421 (1986)). The government must prove such a waiver by a preponderance of the evidence. *United States v. Anderson*, 929 F.2d 96, 99 (2d Cir. 1991). "[T]he question of waiver must be determined on 'the particular facts and circumstances surrounding that case, including the background, experience, and conduct of the

accused." *North Carolina v. Butler*, 441 U.S. 369, 374-75 (1979). To be voluntary, a waiver must be "the product of a free and deliberate choice rather than intimidation, coercion, or deception." *Moran*, 475 U.S. at 421. "Resolution of this issue requires inquiry into the conduct of the government in obtaining the statement." *United States v. Ho*, 930 F. Supp. 858, 862 (W.D.N.Y. 1995). To be knowing and intelligent, a defendant making a waiver must do so with "full awareness of both the nature of the right being abandoned and the consequence of the decision to abandon it." *Colorado v. Connelly,* 479 U.S. 157, 188 (1986).

However, "[t]he Constitution does not require that a criminal suspect know and understand every possible consequence of a waiver of the Fifth Amendment privilege." *Spring*, 479 U.S. at 574. Proper *Miranda* warnings protect the Fifth Amendment privilege by "ensuring that a suspect knows that he may choose not to talk to law enforcement officers, to talk only with counsel present, or to discontinue talking at any time." *Id.* "The *Miranda* warnings ensure that a waiver of these rights is knowing and intelligent by requiring that the suspect be fully advised of this constitutional privilege, including the critical advice that whatever he chooses to say may be used as evidence against him." *Id.*

The government introduced sufficient evidence regarding Defendant's English language comprehension to show his waiver was voluntary, knowing, and intelligent. Although it did take two tries, Defendant passed the conversational English testing component of the naturalization exam in 2002. During the "ruse" investigation, which occurred before Defendant knew he was the target of an investigation, Defendant had no difficulty participating in a short conversation in English with the agents. Defendant spoke with his daughter, wife, and agents in English during the morning of the arrest. Defendant's daughter, Amy Rom, told the agents that Defendant does not need a translator because he speaks English "very well." Defendant did not indicate to law enforcement that he needed a translator or was having trouble comprehending English during the arrest nor during interrogations with the agents. Special Agent Baldwin reported that the alleged participants in the phony marriage engagements arranged by Defendant spoke only English. Defendant owned and operated a donut shop in California for fifteen years where he likely interacted with individuals who did not speak Khmer. Further, a review of the Detention Hearing transcript reveals that Defendant is able to comprehend and speak English on at least a basic level.

Moreover, Defendant's daughter, Amy Rom, translated the Miranda warnings into Khmer. Defendant argues that because Amy

Rom has no legal training or background, this Court should not find the warning sufficient. Reply in Supp. of Mot. to Suppress 6. Regardless of the adequacy of the translation, the evidence shows that Defendant was able to intelligently comprehend the *Miranda* warnings which he was orally given in English.

Defendant further argues that the waiver was not voluntary due to coercion or intimidation. Assessing the totality of these circumstances, Defendant's argument falls short. The plainclothes officers knocked on his door and announced their presence when they first encountered Defendant. Only five of the nine law enforcement officers present actually entered Defendant's apartment. The officers did not handcuff Defendant before or during *Miranda* warnings, although Defendant was told to remain seated. Defendant conversed with the officers in English, and his daughter was present to translate if Defendant so desired. Defendant is likely not as unsophisticated with authority as he claims, as he has arranged several international flights where he traveled to Cambodia including stop-overs in other countries. Although Defendant's childhood experiences with the Khmer Rouge were traumatic, the totality of the circumstances show that Defendant made the waiver voluntarily.

In sum, any limited language barrier possessed by Defendant does not appear to have prevented Defendant from making the waiver with "full awareness of both the nature of the right

being abandoned and the consequence of the decision to abandon it." *Jaswal*, 47 F.3d at 542. Furthermore, the circumstances surrounding the waiver were not impermissibly coercive or intimidating. The government has carried its burden to show by a preponderance that Defendant's waiver was knowing, voluntary, and intelligent.

Separate from the question of the validity of the waiver, Defendant argues that his statements were not voluntary. Defendant contends that his "unfamiliarity with the criminal justice system, his lack of English language skills, and his traumatization based on his experiences under the Khmer Rouge" had a coercive or intimidating effect. Mot. to Suppress 14. Although Defendant apparently contends that all statements he made were involuntary, Defendant specifically points to the statements he may have made while in the back of a police car during transport to Boston as involuntary. Defendant makes no new arguments in support of this point, and the government did not address this point in its briefing.

The Fifth Amendment guarantees that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself," U.S. Const. amend. V. Thus, the government may not "procure [a confession] from the accused against his will." *Green v. Scully*, 850 F.2d 894, 900 (2d Cir. 1988). However, the circumstances present during custodial interrogation are

"inherently coercive." *Id.* (citations omitted). "[A] confession is voluntary only when it is truly . . . the product of his free choice." *Id.* (citation omitted). In determining whether a confession is voluntary, a court must conduct "a careful evaluation of the totality of the surrounding circumstances, including the accused's characteristics, the conditions of interrogation, and the conduct of law enforcement officials." *Id.* (citing *Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973)). The government bears the burden of proving by a preponderance that a confession is voluntary. *Id.*

Weighing the totality of the circumstances, the government satisfies its burden of proving by a preponderance that Defendant's confessions were voluntary. The testimony of Special Agents Baldwin and Petterson revealed no exceptional coercive or intimidating circumstances. Defendant proffers no evidence that the circumstances surrounding the interrogation at the Lowell Police Station were so coercive or intimidating as to deprive Defendant of his free will.

Regarding any possible statements Defendant may have made during transport to Boston, Defendant states that he was questioned in transit and the government responds that no questioning occurred. The only evidence on the record consists of Special Agent Baldwin's testimony that Defendant was not questioned in transit. Defendant did not explore this issue

during the hearing. The government carried its burden to prove by a preponderance that any statements Defendant may have made during transport to Boston were made voluntarily.

For the above reasons, Defendant's motion to suppress is **denied**.

Dated at Burlington, in the District of Vermont, this 1st day of November, 2011.

/s/ William K. Sessions III
William K. Sessions III
U.S. District Court Judge